UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

LEE PARRISH, et al.,        :
                                 :
         Plaintiffs,     :    NO: 1:11-CV-00861
                                 :
   v.                      :
                                 :    **OPINION AND ORDER**
CITY OF MASON, et al.,    :
                                 :
         Defendants.     :

This matter is before the Court on Defendants' Motion for Summary Judgment (doc. 32), Plaintiffs' Response in Opposition (doc. 47), Plaintiffs' Supplemental Filing (doc. 50), and Defendants' Reply (doc. 55). Also before the Court is Defendants' Daubert Motion to Exclude Opinion Testimony of Cyril H. Wecht, M.D. (doc. 54), Plaintiffs' Response in Opposition (doc. 57), and Defendants' Reply (doc. 58). The Court held a hearing on these matters on February 26, 2013. For the reasons indicated herein, the Court GRANTS IN PART AND DENIES IN PART Defendants' dispositive motion consistent with this Opinion, and DENIES Defendants' Daubert motion.

**I.  Background**

The Estate of Douglas Boucher brings this case for wrongful death, violation of civil rights, and infliction of emotional distress against Defendant police officers Sean McCormick ("McCormick"), Dan Fry ("Fry"), and the City of Mason, Ohio, alleging the officers improperly stopped Douglas Boucher

("Boucher"), used excessive force against him, and caused Boucher's death.  They further contend Defendant City of Mason ratified the officers' actions, failed to meaningfully investigate the encounter, and failed to properly supervise and train the officers with regard to the use of tasers[1].  The facts have been recounted in the parties' briefing and at the hearing, and can essentially be summarized as follows:

Boucher, a thirty-nine-year old who was larger than 200 pounds, walked into the convenience store of a Speedway gas station at 2:00 A.M. on December 13, 2009, and made a lewd proposition to the lone nineteen-year-old female store clerk.  The store clerk told Boucher he was making her uncomfortable and he needed to leave.

Boucher left, but over twenty hours later, at 11:00 P.M., he returned.  This time, apparently unbeknownst to Boucher, Defendants Mason police officers McCormick and Fry were at the back of the store.  Boucher approached the clerk and apologized for what he had said earlier in the day, however, after having done so, he twice repeated the lewd proposition to the clerk.  The clerk

---

[1]A "taser" is a brand name for a CED, a "controlled energy device," or a ECD, an "electrical control device," used to stun suspects.  A taser can be used in two ways.  One is "drive stun mode" where the taser is applied directly to the suspect.  The other is "probe mode" where probes are shot from the taser and deliver electrical charge through the probes.  Probe mode, the mode used in this case, is designed to incapacitate the subject during the cycle (docs. 47, 57).

retreated toward the police officers where she informed Officer Fry that Boucher had made the same remarks the night before, and asked the officers to have Boucher leave.  At this point Officer McCormick walked around a coffee machine and came face-to-face with Boucher for the first time.  McCormick asked Boucher to repeat what Boucher had stated to the clerk, but Boucher did not respond, and backed away.  Officer McCormick then directed Boucher to leave the store, and Boucher did.  Officer Fry radioed Dispatch at 11:15 P.M. to advise he had an "unknown investigation."

The officers followed Boucher outside the store into the parking lot, having decided to warn him to stay away from the store or be found trespassing, and having suspected Boucher might be intoxicated.  Once outside, the officers noted that Boucher's car was parked outside the marked lanes, and that there was significant damage to the front end of the car.  Boucher yelled to the officers that he was leaving, and reached for his car door.  McCormick ordered Boucher to stop and to turn around.  Boucher told McCormick to get away from him, and McCormick warned Boucher to place Boucher's hands on the vehicle, or McCormick would use a taser on him.  Boucher then complied and placed his hands on the vehicle.

McCormick then handed Fry a set of handcuffs and instructed Fry to handcuff Boucher.  Fry secured Boucher's left hand in a cuff, but before Fry could secure Boucher's right hand, Boucher spun around and struck Fry in the face.  Boucher then

3

struck Fry a second time, and drove Fry into Boucher's vehicle. Fry and McCormick struggled to the ground.

McCormick instructed Fry that McCormick could tase Boucher, so Fry managed to roll away from Boucher. McCormick got a clean shot at Boucher's chest and deployed the taser for a full five-second duration.

After this tasing, Boucher jumped to his feet and ran across three parking spaces away from the Officers, yelling (according to Plaintiffs, for help) to the clerk, who was now outside. Fry ordered Boucher to stop or be tased. Boucher did not stop, so Fry tased Boucher in Boucher's back. Boucher fell face-first on his hands onto the sidewalk in front of the store.

The parties do not dispute any of the above facts, and the Plaintiffs do not claim any excessive force on the part of the officers to this point. That changes now. It is at this point that Boucher is on the ground and not resisting that a third officer, Officer Walker arrived, in response to Fry's radio call to Dispatch.

Walker parked his car within feet of Boucher, hopped out, and saw Boucher on the ground. Walker kneeled down to handcuff Boucher, which Plaintiffs contend, was the exact right thing to do.

However, at this point Officers Fry and McCormick advised Walker to back away, and to instead cover them with his firearm. Walker did so as Fry commenced to tase Boucher five more times,

4

five seconds each, during the next fifty-six seconds.  During this same time Officer McCormick kicked Boucher and struck Boucher two to seven times with his baton.

Officers Fry and McCormick removed Boucher's hands and cuffed him.  Boucher offered no resistance.  The officers rolled Boucher over and realized there was a large amount of blood on Boucher's face and on the ground.  Officer Walker and State Trooper Staples, who had arrived, began CPR.  Medics arrived shortly thereafter, continuing CPR, and transported Boucher to West Chester Medical Center.  Boucher was pronounced dead at West Chester Medical Center.

Plaintiffs allege the final set of tasings, strikes, and kicks after Officer Walker's arrival constitute excessive force on the part of the officers.  They further allege, supported by the report of expert pathologist Cyril H. Wecht, M.D., that the repeated tasing shocks administered to Boucher caused his heart to fail. Defendants counter that Coroner Richard Burkhardt attributed Boucher's death to "basilar skull fracture" sustained when Boucher hit the sidewalk.  Plaintiffs respond that Defendants' forensic pathologist who authored Boucher's autopsy report, Dr. James Swineheart, could not rule out taser-induced heart failure and indicated in his view that he did not think the basilar skull fracture killed Boucher.

These are the basic facts under which the Court must

5

analyze both Defendants' <u>Daubert</u> motion to exclude Dr. Wecht's opinion testimony as unreliable, and Defendants' motion for summary judgment.    Defendants' latter motion is premised on the theory that the officers were entirely justified in their stop of Boucher, and that the law was clearly established that repeated tasings of a suspect that actively resists arrest do not constitute excessive force.    Under such theory, Defendants claim they are entitled to qualified immunity.    Plaintiffs essentially respond that under the applicable "segmenting approach" of <u>Dickerson v. McClellan</u>, 101 F.3d 1151 (6th Cir. 1996), Boucher was not actively resisting when he was on the ground, and for this reason the force applied against him after such point was excessive.    Plaintiffs further respond that in their view, it is a jury question whether Defendants had a reasonable basis to initially stop Boucher, who was leaving the scene as requested after having made inappropriate remarks, which is not a crime.

As the parties did at the hearing, the Court will first address the arguments as to the <u>Daubert</u> motion, and then proceed to the dispositive motion.

## II.  Defendants' Daubert Motion

Defendants challenge the admissibility of the testimony of Dr. Cyril H. Wecht, Plaintiffs' retained expert, under Rule 702 of the Federal Rules of Evidence and <u>Daubert</u>, 509 U.S. 579.  Rule 702 governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge
> will assist the trier of fact to understand the evidence
> or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion
> or otherwise, if (1) the testimony is based on sufficient
> facts or data, (2) the testimony is the product of
> reliable principles and methods, and (3) the witness has
> applied the principles and methods reliably to the facts
> of the case.

Fed. R. Evid. 702.  The trial judge must act as a gatekeeper, admitting only that expert testimony that is relevant and reliable. Daubert, 509 U.S. at 589.  With regard to scientific knowledge, the trial court must initially determine whether the reasoning or methodology used is scientifically valid and is properly applied to the facts at issue in the trial.  Id.  To aid the trial court in this gatekeeping role, the Supreme Court has listed several key considerations: 1) whether the scientific knowledge can or has been tested; 2) whether the given theory or technique has been published or been the subject of peer review; 3) whether a known rate of error exists; and 4) whether the theory enjoys general acceptance in the particular field.  Id. at 592-94.  The Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." Id. at 595.  "[T]he test under Daubert is not the correctness of the expert's conclusions but the soundness of his methodology." Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311 (9th Cir. 1995).

Although Daubert centered around the admissibility of

scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based on specialized or technical, as opposed to scientific, knowledge. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-48 (1999). The trial court's objective "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kuhmo Tire, 526 U.S. at 152. The trial judge enjoys broad discretion in determining whether the factors listed in Daubert reasonably measure reliability in a given case. Id. at 153. The party proffering the expert testimony bears the burden of showing its admissibility under Rule 702 by a preponderance of the evidence. Daubert, 509 U.S. at 592 n.10.

Defendants contend that when they deposed Dr. Wecht, he could not show any studies or experiments supporting his theory that multiple taser shocks cumulatively caused Boucher's death (doc. 54). Defendants argue the only article cited by Dr. Wecht, written by Dr. Douglas Zipes, was based on eight specific cases, and only opined about a possible link between taser strikes to the chest and cardiac disruption (Id.). Defendants contend that Wecht acknowledged the Zipes' article recognized that multiple clinical studies have not shown taser-induced ventricular fibrillation in healthy volunteers, and that several epidemiological studies have

8

not shown a link between taser shocks and sudden death (Id.). Under these circumstances, Defendants contend Wecht's opinion is an unsupported and subjective belief neither based on any medical or scientific tests or experiments, nor based on any review, case study, or other research conducted by Dr. Wecht or anyone else (Id.).

Plaintiffs respond that Defendants quote the most cautious language in the Zipes study, as well as other studies, to arrive at their conclusion that there is no scientific evidence that multiple tasings cause cardiac arrest and death (doc. 57). Plaintiffs contend articles and other materials cited by Dr. Wecht, including by agencies as the National Institute of Justice, show that high duration charges could induce heart irregularities, and one study showed charges induced death in three pigs (Id.). Moreover, the studies, Plaintiffs contend, suggest that although cardiac stimulation may be of little concern for healthy subjects, taser shocks could present problems for those with preexisting conditions such as heart disease or drug intoxication (Id.). Finally, Plaintiffs emphasize that even Defendants' retained expert, Dr. James Swineheart, could not rule out terminal cardiac arrhythmia due to taser, and expressed doubt that Boucher's skull fracture was the cause of Boucher's death (Id.).

Defendants' reply reiterates their view that there is a distinction between taser shots to the chest, as in the Zipes

9

study, and to the back, which was where Boucher received nearly all of his shots. Defendants contend the authorities cited by Plaintiffs recognize that further testing should be conducted regarding the full effects of tasers, and that Dr. Swineheart's testimony is mischaracterized, such that there is a lack of general acceptance in the scientific community regarding Dr. Wecht's theory.

Having reviewed this matter, the Court cannot conclude that Dr. Wecht's theory is essentially "immature" science that should be kept from the jury's consideration. Dr. Swineheart's deposition shows that although he was confident that Boucher's head injuries were severe enough to have caused Boucher's death, he could not exclude the possibility that the electrical shots caused heart failure. The Zipes study shows a link between taser shots and cardiac arrest, and studies on pigs confirm taser shots can indeed lead to heart failure. As such, there is adequate publication and peer review of Dr. Wecht's theory to support its admissibility.[2] Moreover, the Court notes that Dr. Wecht has a long track record of testimony as a forensic pathologist, and Dr. Wecht has testified in a 2005 case that tasers did not contribute

_____

[2] The Court finds this matter analogous to <u>Schott v. I-Flow</u>, 696 F. Supp. 2d 898, 905 (S.D. Ohio 2010) in which the Court found Plaintiffs' argument persuasive that they were unable to obtain epidemiological studies, as conducting any such studies would be unethical.

death in an Indiana case. The fact that Dr. Wecht has opined in a number of taser cases, and at least in one case found tasing did <u>not</u> contribute to death—-due to where the taser shots hit and "underlying cardiovascular pathology"-- demonstrates indicia of reliability. A jury can properly evaluate Dr. Wecht's opinion as against the other expert opinions proffered in this case, to arrive at a factual conclusion whether the tasings applied to Boucher caused or contributed to his death.

Having thus concluded that Defendants' <u>Daubert</u> motion should be denied, the Court now addresses Defendants' dispositive motion.

**III. Defendants' Motion for Summary Judgment**

**A. Applicable Legal Standard**

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; <u>see also</u>, <u>e.g.</u>, <u>Poller v. Columbia Broadcasting System, Inc.</u>, 368 U.S. 464 (1962); <u>LaPointe v. United Autoworkers Local 600</u>, 8 F.3d 376, 378 (6th Cir. 1993); <u>Osborn v. Ashland County Bd. of Alcohol, Drug Addiction and Mental Health Servs</u>., 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam). In reviewing the instant motion, "this Court must

11

determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993), quoting in part Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986) (internal quotation marks omitted).

The process of moving for and evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well settled. First, "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact [.]" Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also LaPointe, 8 F.3d at 378; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). The movant may do so by merely identifying that the non-moving party lacks evidence to support an essential element of its case. See Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the non-movant, after completion of sufficient discovery, must submit evidence in support of any material element of a claim or defense at issue in the

motion on which it would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact. See Celotex, 477 U.S. at 317; Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). As the "requirement [of the Rule] is that there be no genuine issue of material fact," an "alleged factual dispute between the parties" as to some ancillary matter "will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-248 (emphasis added); see generally Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1310 (6th Cir. 1989). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252; see also Gregory v. Hunt, 24 F.3d 781, 784 (6th Cir. 1994). Accordingly, the non-movant must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 339-340 (6th Cir. 1993); see also Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.

Although the non-movant need not cite specific page numbers of the record in support of its claims or defenses, "the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts

13

upon which the non-moving party relies." <u>Guarino</u>, 980 F.2d at 405, <u>quoting</u> <u>Inter-Royal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989) (internal quotation marks omitted). In contrast, mere conclusory allegations are patently insufficient to defeat a motion for summary judgment. <u>See</u> <u>McDonald v. Union Camp Corp.</u>, 898 F.2d 1155, 1162 (6th Cir. 1990). The Court must view all submitted evidence, facts, and reasonable inferences in a light most favorable to the non-moving party. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970); <u>United States v. Diebold, Inc.</u>, 369 U.S. 654 (1962). Furthermore, the district court may not weigh evidence or assess the credibility of witnesses in deciding the motion. <u>See</u> <u>Adams v. Metiva</u>, 31 F.3d 375, 378 (6th Cir. 1994).

Ultimately, the movant bears the burden of demonstrating that no material facts are in dispute. <u>See</u> <u>Matsushita</u>, 475 U.S. at 587. The fact that the non-moving party fails to respond to the motion does not lessen the burden on either the moving party or the Court to demonstrate that summary judgment is appropriate. <u>See</u> <u>Guarino</u>, 980 F.2d at 410; <u>Carver v. Bunch</u>, 946 F.2d 451, 454-455 (6th Cir. 1991).

**B. Discussion**

Defendants attack both of Plaintiff's constitutional claims, for unreasonable stop in violation of Fourth Amendment rights, and for use of excessive force, contending the officers'

14

actions were justified and reasonable (doc. 32). Defendants further invoke qualified immunity under the theory that under established case law at the time, it was not unreasonable for Defendant officers to believe their use of force against an actively resisting suspect was justified (Id.). Defendants contend because such constitutional claims fail, Plaintiffs' state law claims should similarly be dismissed as unsupported by the evidence (Id.).

### 1. Defendants are Entitled to Summary Judgment as to the Reasonableness of the Initial Stop of Boucher

Plaintiffs contend that as Boucher cooperated with the officers' order that he leave the store, and there was no indication he was armed and dangerous, the officers lacked a reasonable suspicion so as to stop him (doc. 47). The Court disagrees. According to the officers Boucher's behavior and movements in the store appeared "nervous," "fidgety," "erratic," and "frantic." They knew he had been to the store twice, late at night, to say inappropriate things to the lone clerk. Fry thought Boucher might be intoxicated. When they exited the store, Defendants noted Boucher's car was parked outside the marked lanes and that the front of the car was damaged. Viewing the totality of the circumstances, as the Court is required to do in evaluating whether a Terry stop is justified, the Court finds the officers here had a "reasonable, articulable suspicion that [a] person has

been, is, or is about to be engaged in criminal activity." <u>United States v. Hensley</u>, 469 U.S. 221, 227 (1985).  The Court does not find Plaintiff's characterization exactly accurate that Boucher complied with all the officers' commands up until he put his hands on the car.   It appears more accurate that Boucher was acting strangely, he yelled out that he was leaving, and he only cooperated to place his hands on the car under threat of tasing. The officers had to make a quick judgment call, and in the Court's view, they were permitted in this instance to stop Boucher initially to determine whether he had been driving impaired and whether he posed a threat of harm to the lone store clerk.   For these reasons, the Court finds well-taken Defendants' challenge to Plaintiffs' Fourth Amendment claim for improper stop, and dismisses such claim.

### 2. Plaintiffs' Claim for Excessive Force Survives Defendants' Challenge.

Defendants next challenge Plaintiffs' claim that the officers used excessive force when they repeatedly tased Boucher (doc. 32).  Defendants argue that under controlling authority, the use of a taser on a resisting suspect constitutes reasonable use of force (<u>Id</u>., <u>citing</u> <u>Caie v. West Bloomfield Township</u>, No. 11-1378, 2012 U.S. App. LEXIS 12507 (6th Cir. June 18, 2012)).  They further contend that based on law available at the time, the officers could not have known their conduct violated Boucher's rights, so that they are entitled to qualified immunity (<u>Id</u>. <u>citing</u> <u>Hagans v.</u>

16

Franklin County Sheriff's Office, 695 F.3d 505 (2012)).

At the hearing the parties appeared to agree that the proper analytical framework in an excessive force case is a segmenting approach which requires reevaluation of the reasonableness of force as the circumstances change. Dickerson v. McClellan, 101 F.3d 1151 (6th Cir. 1996). The parties focus therefore on the only segment of Boucher's encounter with the officers when he was face down and not moving, which is the only segment that Plaintiffs challenge as involving excessive force. Under such approach the officers must have acted reasonably during the application of force and in the few moments directly preceding it. Bouggess v. Mattingly, 482 F.3d 886, 889 (6th Cir. 2007).

The Court agrees that though a "segmenting" analysis is correct, Defendants are also correct in that the officers' actions must be viewed within the context of the totality of events. Because the ultimate question is whether the officers' actions were reasonable, the use of force "analysis must consider all of the knowledge possessed by [the officer] at the moment he determined to employ. . .force. We cannot simply take a snapshot of the moment and consider it in isolation from other information." Bouggess, 426 F. Supp. 2d at 607. Moreover, in determining whether there has been excessive force, the Court does not consider "the extent of the injury inflicted, but rather whether an officer subjects a detainee to gratuitous violence." Hagans, 695 F.3d at 511, quoting

17

<u>Miller v. Sanilac County</u>, 606 F.3d 240, 252 (6th Cir. 2010).

The Court has reviewed the videotape which shows Boucher's encounter with the officers inside the store, and which shows to a much lesser extent the events outside the store. It is clear that this was a rapidly unfolding situation, and that Boucher is not a sympathetic character. However, what gives the Court pause is that Defendants repeatedly tased Boucher in such manner that a jury might find he was subjected to gratuitous violence from officers that momentarily "lost it." It appears to be a factual determination whether Boucher was "actively" resisting at the point he was on the ground or whether he was even alive. Such factual determination is for a jury and sets this case apart from those cited by Defendants involving active resistance. The Court further finds well-taken Plaintiffs' argument that Officer Walker arrived and approached Boucher in a less aggressive way. Of course Defendants knew they were dealing with a volatile and unpredictable individual, having been assaulted by Boucher. However the Court disagrees with Defendants' contention that they "could not have known that Boucher's failure to comply with the Officers' orders was anything other than his continued resistance to arrest" (doc. 55). Taking all inferences in favor of the non-moving party, a reasonable fact-finder might conclude the Defendants could have known Boucher's failure to comply while face-down was something other than resistance, and could conclude that

18

the five tasings crossed the line of reasonableness.

At the hearing Defendants further argued they are entitled to qualified immunity[3] because the law was clearly established that officers do not violate the Fourth Amendment by using a taser to subdue a suspect that is actively resisting arrest.  For the same reasons articulated above, the Court finds that although Defendants correctly state the law, the facts of this matter could be viewed such that the suspect was not resisting at the time of the repeated tasings.  The law was clearly established that the use of a taser on an incapacitated suspect that is not resisting is excessive force.  <u>Roberts v. Manigold</u>, 240 Fed. Appx. 675, 678 (6th Cir. 2007)(repeated tasing of an immobilized defendant pinned down by officer objectively unreasonable), <u>Shreve v. Jessamine County Fiscal Court</u>, 453 F.3d 681 (6th Cir. 2006)(use of force unjustified on suspect incapacitated by pepper spray), <u>Kies ex rel. Kies v. City of Lima, Ohio</u>, 612 F.Supp.2d 888 (N.D. Ohio March 2009)(passive resistance does not warrant repeated beatings and tasings after plaintiff already brought to the ground).  The Court therefore rejects Defendants' argument that they are entitled to qualified immunity.

_____

[3] "Qualified immunity protects government officials against suit for the performance of discretionary functions so long as the conduct in question 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Levin v. Childers, II</u> 101 F.3d 44, 46 (6th Cir. 1996) <u>citing</u> <u>Veney v. Hogan</u>, 70 F.3d 917, 920 (6th Cir. 1995) (<u>quoting</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800,(1982)).

### 3. Plaintiffs' Claim for Violation of Substantive Due Process

Plaintiffs plead in the alternative a claim for violation of substantive due process rights under the theory that Defendants' actions could be found by a jury to shock the conscience. The Court finds Defendants' position well taken that the proper analytical framework for this case arises from the reasonableness standard of the Fourth Amendment rather than from the rubric of substantive due process. <u>Graham v. Connor</u>, 490 U.S. 386, 395 (1989)("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that amendment, not the more generalized notion of 'subtantive due process,' must be the guide for analyzing these claims.") As such, the Court dismisses the substantive due process claim.

### 4. Claims Against Defendant City of Mason

Plaintiffs claim the City is liable for ratifying the Officers' Fry and McCormick's use of force, as its review of the use of force resulted in approval which confirms the officers were acting according to official policy (doc. 47). Plaintiffs also contend Defendant City failed to meaningfully investigate the alleged unconstitutional conduct (<u>Id</u>.).

The City contends it obtained two independent reviews,

20

and that in addition, it reviewed the case file, the incident reports, the officers' statements, and the results of third-party investigations (doc. 55). As such, the City contends it conducted a "meaningful investigation," as required under Wright v. City of Canton, 138 F.Supp.2d 955, 966 (N.D. Ohio 2001)(Id.).

The Court finds that a reasonable jury could find a genuine issue as to whether the City conducted a meaningful investigation in this instance. Plaintiffs indicate the officers failed to complete use of force reports by the end of their shift whenever there is a death or a taser used, as required by policy. Plaintiffs signal inconsistencies between the officers' written statements and the evidence from the taser download report, including that the officers omitted from their statements that Officer Fry tased Boucher six times. The statements were prepared with the assistance of attorneys weeks after Bouchers' death. The City also chose not to interview Officer Walker, the only Mason officer who did not use force, and chose not to test the tasers despite such recommendation of the Ohio Bureau of Criminal Identification and Investigations. A reasonable fact-finder might conclude such actions show the City ratified the officers' actions rather than conducting a meaningful review.

Plaintiffs next contend the City is liable for failure to train its officers from using excessive force because it failed to adequately train and supervise the use of tasers. A municipality

21

may be held liable where its failure to train "amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989).

Defendants respond there is not evidence that Officers Fry and McCormick were inadequately trained or supervised, that their training was inadequate, or that there was deliberate indifference to train or supervise by the police department (doc. 55). Defendants further indicate, in their view, there is not evidence that inadequate training caused Boucher to suffer any injury (Id.).

Plaintiffs indicate that in October 2009 the manufacturer of the tasers issued a bulletin warning that sudden cardiac arrest can occur when a suspect is tased in the chest area and warned that to reduce risk of cardiac arrest officers should not aim for center mass (doc. 47). Although Defendants contend the City integrated recommendations from such bulletin at the roll call training for all shifts of officers prior to December 13, 2009, Plaintiffs proffer Defendant McCormick's testimony that McCormick aimed at Boucher's center mass in the chest area (Id.). Due to this evidence, a jury might find that the City failed to adequately implement the warnings regarding aiming taser shots at the center mass of a suspect. As such, the Court does not find summary judgment appropriate as to Plaintiffs' claim for failure to train

or supervise.

### 5. State Law Claims

Finally, Defendants contend they are entitled to summary judgment as to Plaintiffs' state law claims for wrongful death and intentional infliction of emotional distress (docs. 32, 55). The Court disagrees. Plaintiffs' expert opinion is that the multiple taser shocks used against Boucher precipitated a fatal cardiac arrythmia. For the same reasons supporting Plaintiffs' excessive force claim, that the multiple tasings might be viewed as gratuitous or reckless, the Court finds sufficient evidence for a jury's consideration of Plaintiffs's state law claims. The Court denies Defendants summary judgment as to such claims.

## IV. Conclusion

This is a sad and difficult case in which an unsympathetic suspect was properly stopped but violently resisted the police investigation. The Court finds neither a basis for Plaintiffs' challenge to the initial stop, nor for Plaintiffs' substantive due process claim. However, the Court concludes that a jury might find the repeated tasings inflicted on Boucher after he was on the ground may have crossed the line of reasonableness. For this reason Plaintiffs' excessive force claim survives Defendants' challenge. Moreover, there is adequate record evidence to call into question Defendant City of Mason's ratification of the officers' actions, its

23

investigation of the event, and its training and supervision regarding the use of tasers. As such, the Court rejects Defendants' challenge of such claims against Defendant City of Mason. Finally, the Court's review of the excessive force claims is equally applicable as to Plaintiffs' state law claims; Plaintiffs' claim for wrongful death is supported by the admissible testimony of its expert, Dr. Cyril Wecht.

Accordingly, the Court DENIES Defendants' Daubert Motion to Exclude Opinion Testimony of Cyril H. Wecht, M.D. (doc. 54), and GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment (doc. 32), such that Plaintiffs' claims for excessive force, claims against Defendant City of Mason, and state law claims all survive Defendants' challenges and are proper for consideration by a jury. The Court DENIES Defendant Officers qualified immunity because it was established law at the time that it is objectively unreasonable to use a taser against an immobilized suspect who is not resisting, and the facts of this matter could be viewed to show they applied gratuitous violence against Boucher. Finally the Court SETS this matter for a settlement conference on April 24, 2013 at 3:00 P.M., for final pretrial conference on May 29, 2013 at 3:00 P.M., and for a five-day jury trial to commence on June 18, 2013 on an on-deck basis.

SO ORDERED.

Dated: March 21, 2013          s/S. Arthur Spiegel
                               S. Arthur Spiegel
                               United States Senior District Judge